UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
––––––

DEONTAE GORDON,

     Plaintiff,     Case No. 1:12-cv-295

v.            Honorable Janet T. Neff

UNKNOWN BENSON et al.,

     Defendants.
_____/

## OPINION

    This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Bassett, MacDonald, Murtland, and Thomas. The Court will allow service of the complaint on Defendants Benson, Haske, Hornkohl, McCarey, Mitchell, and Little.

Also before the Court is Plaintiff's motion for a preliminary injunction and/or a temporary restraining order (docket #3).  Plaintiff's motion will be denied.

### Discussion

I.      Factual allegations

Plaintiff Deontae Gordon is a state prisoner incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility, though the events giving rise to this action occurred while he was incarcerated at the Oaks Correctional Facility (ECF).  He sues the following employees of ECF:  Resident Unit Officers (RUOs) (unknown) Benson and (unknown) Murtland; Assistant Resident Unit Supervisors (ARUSes) (unknown) McCarey and (unknown) Mitchell; Classification Director Amy Haske; Resident Unit Manager (RUM) (unknown) Thomas; Correctional Officer (unknown) Hornkohl; Librarian C. Little; and Grievance Coordinators Maryellen MacDonald and T. Bassett.

According to the complaint, on July 29, 2011, Plaintiff was assigned a work detail as a laundry worker in Unit 4, working from 12:00 p.m. to 6:00 p.m., Tuesday through Saturday. RUO Benson was the officer in charge of calling prisoners to work in Unit 4.  After waiting for over a week to work his shift, Plaintiff asked Benson why she had not called him to work.  She told him, "I DON'T ALLOW NATION OF ISLAM MEMBERS TO WORK IN MY UNIT ANYMORE." (Compl. ¶ 21, docket #1.)  Plaintiff filed a grievance regarding this incident.  (*See* Ex. D, Grievance No. ECF-2011-08-2383-17D.)

On August 16, Benson reviewed Plaintiff's grievance with him.  She asked Plaintiff how he would feel if she wrote a threatening behavior misconduct on him.  Plaintiff asked her if he would be allowed to work, but she told him, "You can go back to your cell, you'll never work in this

unit!" (Compl. ¶ 28.)  Plaintiff filed a grievance about Benson's statements.  (*See* Ex. F, Grievance No. ECF-2011-08-2423-17z.)

As Plaintiff waited to be called to work, inmate Whyte, a non-Muslim prisoner assigned to work a different shift as a hall porter, worked Plaintiff's assigned detail almost every day after Plaintiff received his assignment.  On August 17, prison officials discovered a journal in Whyte's cell documenting an intimate relationship between Benson and Whyte.

Plaintiff was not called to work until August 19, when Benson was not in the unit. When Plaintiff was called to work again on the evening of August 23, Benson called Plaintiff into the back laundry room.  She asked Plaintiff to stop pursuing grievances against her because "she could not afford any more heat" due to an investigation into her relationship with Whyte.  (Compl. ¶ 36.)  She promised to start calling Plaintiff to work, and to fabricate payroll documents for all the days that he did not work, so long as he stopped filing grievances.  Plaintiff was then called to work nine times between August 24 and September 6, 2011.  Benson fabricated payroll documents to pay Plaintiff for every scheduled workday in August, including days that Plaintiff had not worked.

On September 7, Plaintiff filed another grievance against Benson, claiming that she fabricated payroll documents.  (*See* Ex. G, Grievance No. ECF-2011-09-2066-02-C.)  Thereafter, Benson did not call Plaintiff back to work until September 16.  On September 21, ARUS McCarey asked Plaintiff to "sign off" on the September 7 grievance against Benson.[1]  (Compl. ¶ 42.)  When Plaintiff refused, McCarey told Plaintiff that there would be "consequences" if he did not sign off. (*Id.*)  Plaintiff filed a grievance about McCarey's threat. (Ex. H, Grievance No. ECF-2011-09-2826-

---

[1]To "sign off" on a grievance apparently means that the prisoner-grievant believes that the grievance has been resolved.  At the bottom of the grievance form (CSJ-247A) is a line for "Grievant's signature."  (*See* Ex. G.)  Next to that line the form reads: "If resolved at Step I, Grievant sign here."  (*Id.*)

17a.)[2]  Plaintiff interpreted McCarey's comment as an insinuation that "Plaintiff would be sent to the hole."  (Compl. ¶ 42.)

Plaintiff worked again on September 22 and 23.  On September 23, Defendants Benson and McCarey fabricated a negative work evaluation about Plaintiff, claiming, among other things, that Plaintiff did not report to work on time, did not follow safety rules, did not follow instructions, and did not cooperate with authority.  (Compl. ¶ 44; Ex. I, Prisoner Program & Work Assignment Evaluation.)

Plaintiff worked again on September 29 when Benson was not in the unit.  That evening, Classification Director Haske informed Plaintiff that he was "laid in" from his work detail in Unit 4 and would be reclassified.  (Compl. ¶ 47.)  Plaintiff has not worked in Unit 4 since that time.

On October 6, Plaintiff asked Haske why she had not assigned him to a new work detail.  Haske told Plaintiff that he "needed to learn to keep his mouth shut and stop filing grievances." (Compl. ¶ 49.) Plaintiff filed a grievance about Haske's statements. (Ex. K, Grievance No. ECF-2011-10-30003-28c.)  Grievance Coordinator MacDonald, a "close friend" of Haske, improperly rejected Plaintiff's grievance to deter Plaintiff from pursuing it.  (Compl. ¶ 50.)

On October 10, while Plaintiff was in the law library during his library callout, he requested permission to speak with Officer Hornkohl, who was in the hallway adjacent to the library.  Hornkohl gave his permission, so Plaintiff stepped into the hallway.  About a minute later, as Plaintiff was speaking with Hornkohl, Haske walked past them.  Plaintiff turned toward Haske and

---

[2]According to the grievance, McCarey told Plaintiff, "[I]f you don't sign off and continue to write grievances against [Benson], there's going to be consequences, your [sic] going to find yourself in 4 block, but not for work."  (Ex. H.)

asked if he could speak with her to resolve an issue before filing a grievance.  Haske said "no!" and walked away.  (Compl. ¶ 54.)  Plaintiff finished his conversation with Hornkohl and went back into the law library.  A few minutes later, Hornkohl called Plaintiff back into the hallway to speak with Haske.  Haske asked for Plaintiff's identification and told Plaintiff that he would be receiving a misconduct notice.  An hour later, Haske wrote a Class III misconduct report charging Plaintiff with being out of place.  (Ex. M, 10/10/2011 Misconduct Report.)  According to the report, Plaintiff had stepped into the hallway adjacent to the library without authorization on several prior occasions, for the purpose of speaking with Haske, and he did so again on October 10.  (*Id.*)  Hornkohl corroborated the report, stating that he did not authorize Plaintiff to be in the hallway or to speak with Haske.  ARUS Mitchell reviewed the misconduct charge, spoke with Haske and Hornkohl, and found Plaintiff guilty of the misconduct without a hearing.  As punishment, Plaintiff lost privileges for 7 days.  Plaintiff filed a grievance against Haske, Hornkohl, and Mitchell regarding the misconduct charge and conviction.  (*See* Ex. O, Grievance No. ECF-2011-10-3152-27a.)  Plaintiff alleges that Grievance Coordinator Bassett improperly rejected the grievance to deter him from pursuing it.

On October 11, Haske, RUO Murtland, and RUM Thomas allegedly fabricated another negative work evaluation about Plaintiff.  (*See* Ex. Q, 10/11/2011 Prisoner Program & Work Assignment Evaluation.)  The evaluation report indicates that Plaintiff did not come to work on the correct days, did not follow all safety rules, did not cooperate with authority, did not perform tasks assigned to him, and required constant supervision.   In the comments section, the report states "Reclass[ify.] He is not progressing in his assignment."  (*Id.*)  Plaintiff filed a grievance about this report, claiming that it was fabricated because he had not worked since September 29 and there is

no reason why Defendants would have waited until October 11 to report the violations mentioned. (*See* Ex. R, Grievance No. ECF-2011-10-3153-02b.)  In response to the grievance, Plaintiff was told that the report would be corrected and a new one would be completed by Inspector Schiebner (who is not a Defendant in this action).   The corrected report merely states that Plaintiff will be reclassified from his work assignment due to "not progressing on assignment."   (*See* Ex. S, 10/21/2011 Prisoner Program & Work Assignment Evaluation.)

On November 3, 2011, Plaintiff received a Program Classification Report prepared by Defendant Haske which states:  "No library work @ ECF due to 017 on 8/24/07 & 007 on 2/1/10."  (Ex. T, 09/29/2011 Program Classification Report.)[3]  An "017" is a failure to disperse misconduct, and an "007" is a non-serious assault misconduct.  (Compl. ¶ 75.)  According to ECF Operating Procedures, there are four work assignments that a prisoner may not receive if there is a security concern.  (*Id.* ¶ 76.)  Work in the law library is not one of those assignments.  Plaintiff contends that Haske singled out Plaintiff for disparate treatment because she assigned John Muriel, an inmate who has a history of staff assaults and weapons possession misconducts, to work in the library.  Plaintiff filed a grievance regarding Haske's decision.  (Ex. U, Grievance No. ECF-2011-3410-27b.)  Defendant Bassett improperly rejected the grievance to deter Plaintiff from filing grievances.

---

[3]The comments section of the report states, in full:
  Reclassify at Staff's request to:
  1. Food Service
  2. Law library / - Denied - No library work @ ECF due to 017 on 8/24/07 & 007 on 2/1/10.

The report is signed by a "Team Member/Counselor" and by "Prisoner" on September 29.  (Ex. T.)  It is signed by Defendant Haske on October 3, 2011.  (*Id.*)

On November 10, Plaintiff submitted a request to make copies of documents so that he could appeal the response to the grievance against Defendant Benson regarding the fabricated payroll statements.  Librarian Little reviewed Plaintiff's documents and confiscated a document titled "July 4 Payroll for Unit 4 Porters: Entered by Defendant Benson," which she turned over to Assistant Deputy Warden (ADW) Sharp for inspection as possible contraband.  (Compl. ¶ 83; Ex. V, Photocopy Disbursement Authorization; Ex.W, Contraband Removal Record.)  Plaintiff filed a grievance regarding the confiscation, but he did not receive a response until December 22, when he discovered that MacDonald had improperly rejected it.  Since November 10, 2011, Defendants MacDonald and Bassett have refused to acknowledge or process any of Plaintiff's other grievances. When Plaintiff saw Defendant MacDonald in December, he asked her to start processing his grievances, but she mocked him by making a sound like a crying baby.

On December 1, Plaintiff asked Defendant Little three times to make copies of legal documents in connection with the appeal of his criminal case to the United States Supreme Court. The first two times that Plaintiff asked Little, she ignored him.  The third time, she stated: "Last time I made copies for you I had to confiscate them because the documents could have gotten Benson and Haske fired.  I'm not making copies for you anymore."  (Compl. ¶ 91.)  Plaintiff then left the library and went to the control center to report the situation to the Inspector.  At the control center, he spoke with two officers about Little's conduct.  One of the officers issued Plaintiff an out-of-place misconduct. The other officer said that he would look into it.  Later that evening, Plaintiff spoke with Deputy Warden Ball and ADW Sharp about Little's refusal to make copies, and they said that they would look into it.

The following day, Little requested a 30-day law library restriction for Plaintiff because Plaintiff had received an out-of-place misconduct during his law library callout. (Ex. X, 12/07/2011 Admin. Hr'g Report, docket #1-4, Page ID#109.) MDOC policy provides that prisoners who commit misconducts in the law library may be temporarily barred from accessing it.[4] According to Little, Plaintiff left the law library without authorization, though Plaintiff asserts that he was not required to stay in the library for the duration of his callout. The hearing officer noted that Plaintiff went to the control center without authorization during his library callout, but denied Little's request because the misconduct did not occur inside the library itself. (*Id.*) Plaintiff claims that Little "falsified" her report in retaliation for Plaintiff's past grievances and for speaking with her supervisors about her refusal to make copies.

On December 5, Plaintiff asked ARUS Mitchell to provide him with law books because Plaintiff had been taken off of library callout pending resolution of Little's request for a library restriction. Plaintiff explained to Mitchell that he needed copies for his criminal appeal. Mitchell told Plaintiff, "'F**k off Gordon, you don't have anything coming, don't cry now, play ball!'" (Compl. ¶ 102.) Later that day, during Mitchell's mail rounds, Plaintiff attempted to mail complaints to internal affairs and the warden and deputy wardens of ECF regarding MacDonald and Bassett's refusal to process his grievances. Mitchell looked at Plaintiff's documents and told him "that Plaintiff would never learn, and until Plaintiff learn[s] to stop being so rebellious he was going

---

[4]MDOC Policy Directive 05.03.115 ¶ Z (eff. Nov. 1, 2010) provides:

A prisoner who engages in conduct in the main or mini law library for which a Class I or Class II misconduct will be written shall have that session terminated and be required to leave the library; the prisoner also may be temporarily barred from further access to the library pending the hearing on the misconduct. If the prisoner is found guilty of the misconduct, s/he may be barred from further access to the library; in such cases, items from the required main law library collection shall be brought to the prisoner in the same manner as for segregation prisoners.

to 'Make it Hard' on Plaintiff." (Compl. ¶ 105.) That evening, Mitchell moved Plaintiff to a "restrictive transition unit designated for new ride-ins and inmates who[] [have] just been released from Segregation." (Compl. ¶ 106.) Inmates in the transition unit have more limited yard privileges and are not allowed to work outside the unit, so Plaintiff lost his job, the "highest paying job at the facility." (Compl. ¶ 107.) In addition, because he lost his job, Plaintiff "forfeited credits toward his custody reduction, which he was due to receive in January 2012." (*Id.* ¶ 108.)

On December 14, Officer Kartes gave Plaintiff a pass to go to the library. When Plaintiff arrived at the library, he told Little that he wanted to make legal copies. She responded, "'You don't have nothing coming.'" (Compl. ¶ 113.) As Plaintiff waited for Little to make the copies, an officer asked Plaintiff for his pass, which Plaintiff provided. A few minutes later, Defendant Hornkohl told Plaintiff to leave the library, stating that Plaintiff did not have authorization to be there. Plaintiff tried to explain that he had a pass from Officer Kartes, but Hornkohl confiscated the pass, told Plaintiff that he would not receive copies, and stated that Plaintiff would receive a major out-of-place misconduct ticket. Plaintiff never received a ticket, however. Plaintiff filed a grievance regarding this incident, but his grievance was not acknowledged or processed. He also reported the incident to internal affairs, the warden and deputy wardens of ECF, and the corrections ombudsman in Lansing, Michigan. That evening, Officers Montague and Pierson told Plaintiff that they would make sure that he would receive his copies.

The next day, December 15, Montague told Plaintiff that Little had been ordered to make Plaintiff's copies, and that she would call Plaintiff to the library to make them. On December 17, Plaintiff met with Little at the library. She was "overly nice"; she asked Plaintiff to "let the past be the past," and she told him that she would give Plaintiff extra law library time. (Compl. ¶ 124.)

Based on the foregoing facts, Plaintiff contends that Defendants violated his rights under the First and Fourteenth Amendments.[5]  As relief, he seeks a declaratory judgment, an injunction expunging fabricated documents from his records, and compensatory and punitive damages.  (Compl., Page ID#39.)

II.      Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief."  *Iqbal*, 129 S. Ct. at 1950 (quoting FED. R. CIV. P.

---

[5]While Plaintiff's complaint purports to separate his claims under different subject headings (e.g., "[Claim] I. DENIAL OF EQUAL PROTECTION . . ." (Compl., docket #1, Page ID#9), the Court will not refer to those headings in its analysis because many of Plaintiff's claims do not match their respective subject headings.

8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Equal Protection

Plaintiff claims that Defendants Benson, Haske, Mitchell, Murtland, and Thomas violated his right to equal protection under the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Clause "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Where neither a fundamental right nor a suspect class is at issue, the rational basis review standard applies. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006). In addition, a plaintiff who does not allege discrimination based on membership in an identifiable class or group may state a "class-of-one" claim by alleging that he "has been

intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens,* 411 F.3d 697, 710 (6th Cir. 2005)).

### 1. Benson

Benson stated that she would not call Plaintiff to work his assigned detail because she does not allow members of the Nation of Islam to work in her unit. Plaintiff's allegations suffice to state an equal-protection claim against Defendant Benson.

### 2. Haske

Haske determined that Plaintiff could not work in the prison library because of his past misconducts, though she allowed another inmate with more serious misconducts to do so. Plaintiff does not allege that Haske's decision implicated a fundamental right, as Plaintiff does not have a constitutional right to a particular prison job, or any job. *See Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989). Moreover, Plaintiff does not allege that Haske discriminated against him as a member of an identifiable group or class; he merely contends that Haske treated Plaintiff differently from another prisoner. Thus, Plaintiff alleges a class-of-one claim, to which rational-basis review typically applies. *See Davis v. Prison Health Serv.*, --- F.3d ----, No. 10–2690, 2012 WL 1623216, at *6 (6th Cir. May 10, 2012). The Supreme Court recognizes, however, that certain kinds of state action are not amenable to rational-basis review, particularly employment decisions and other forms of discretionary decisionmaking:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008). Deciding whether a prisoner should be permitted to work in a particular prison job is precisely the sort of discretionary decision contemplated by the court in *Engquist*. *See id.* at 604 ("This principle [barring rational-basis scrutiny] applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify."). There are a multitude of legitimate reasons why prison officials might conclude that assigning a particular prisoner to work in a particular position or in a particular area of the prison could create unnecessary risks or challenges,[6] and court scrutiny of such decisions via rational-basis review would unduly hinder prison management. In light of *Enquist*, therefore, Plaintiff does not state an equal-protection claim against Haske.[7]

---

[6]For example, MDOC Policy Directive 05.01.100 ("Prisoner Program Classification") provides:

> Institutional needs and resources, custody and security concerns, any special needs of the prisoner, the prisoner's eligibility for reduced custody, discharge, and parole and, to the extent possible, the prisoner's preference also shall be considered when making program classification decisions. A prisoner's history of *assaultive or predatory behavior* shall be considered before assigning a prisoner to a sensitive or isolated assignment or to an assignment supervised by only one staff person.

*Id.* ¶ E (emphasis added). Thus, even if ECF policies list only four positions that are not available to certain prisoners for security reasons, a prisoner's history of misconduct is still relevant for other work assignments.

[7]To the extent Plaintiff contends that Haske's decision violated prison policy, he does not state a claim because § 1983 does not provide redress for such a violation. *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).

### 3.  Mitchell, Murtland and Thomas

Plaintiff contends that Mitchell imposed sanctions on Plaintiff at an administrative hearing and that Murtland and Thomas helped prepare false work evaluations about Plaintiff, but Plaintiff alleges no facts indicating that Defendant Mitchell, Murtland, or Thomas treated Plaintiff differently from those similarly-situated with him. *See Vill. of Willowbrook*, 528 at 564.  The fact that Defendants treated Plaintiff poorly or unfairly is not, in itself, an equal-protection violation. Thus, Plaintiff does not state an equal-protection claim against Defendants Mitchell, Murtland and Thomas.

### B.      Retaliation

Plaintiff claims that Defendants Bassett, Benson, Haske, McCarey, Hornkohl, Little, MacDonald, and Mitchell retaliated against Plaintiff to deter him from engaging in protected conduct.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Thaddeus-X*, 175 F.3d at 394.

With respect to the first element of a retaliation claim, filing a prison grievance is constitutionally-protected conduct for which a prisoner cannot be subjected to retaliation.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).  With respect to the second element, adverseness is an objective inquiry, and does not depend on how a particular plaintiff reacted.  The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness;"

the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002). Even a specific threat of harm may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from engaging in protected conduct, *see, e.g., Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results). However, certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations. *Thaddeus-X*, 175 F.3d at 398; *see Yarrow*, 78 F. App'x at 541.

As to the third element, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). Nevertheless, "alleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive).

### 1. Bassett, MacDonald

Plaintiff alleges that Defendants Bassett and MacDonald refused to process Plaintiff's grievances or rejected them for improper reasons. The denial of a grievance, or the refusal to respond to one, is not sufficiently adverse to state a retaliation claim. *See Burgos v. Canino*, 641 F. Supp. 2d 443, 455 (E.D. Pa. 2009) ("[T]he mere denial of grievances does not rise to the level of adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights."); *Alexander v. Fritch*, No. 07-1732, 2010 WL 1257709, at *18 (W.D. Pa. Mar. 26, 2010) (same). Indeed, the denial of, or refusal to process, a grievance has no meaningful adverse impact on a prisoner. It does not alter the prisoner's status or change the conditions of his confinement, and the prisoner is still free to pursue other means of remedying the grieved issue, including filing another grievance, appealing to a higher official, or commencing legal action.

Plaintiff asserts that Defendants' actions have effectively prevented him pursuing civil rights claims on the issues stated in his grievances because he has not been able to exhaust his administrative remedies. As indicated in Section I.C., *infra*, however, Defendants' conduct in connection with the grievance process cannot compromise Plaintiff's ability to pursue a civil-rights action. Therefore, Plaintiff fails to state a retaliation claim against Defendants Bassett and MacDonald because their actions were not sufficiently adverse to deter a person of ordinary firmness from engaging in protected conduct.

### 2. Benson, Haske, Hornkohl, Little, McCarey, and Mitchell

Plaintiff asserts that the following conduct by Defendants Benson, Haske, Hornkohl, Little, McCarey, and Mitchell supports retaliation claims against them: (1) after Plaintiff filed a grievance about Benson's refusal to call him to work, Benson allegedly threatened to file a

misconduct on Plaintiff and asked Plaintiff not to pursue the grievance against her, and after Plaintiff filed a grievance regarding Benson's fabrication of the payroll documents, Benson refused to call Plaintiff back to work between September 7 and 16 and later fabricated a negative work evaluation about him; (2) after Plaintiff filed grievances against Benson, Haske removed Plaintiff from his work detail, told Plaintiff that he needed to stop filing grievances if he wanted a work assignment, and later prepared a negative work evaluation about Plaintiff; (3) when Plaintiff attempted to obtain copies of legal documents in the library, Hornkohl confiscated Plaintiff's library pass, threatened to charge him with a major misconduct, and made him leave the library; (4) after Little saw Plaintiff's grievance against Benson regarding the fabricated payroll statements, she confiscated as contraband a document needed for the appeal of that grievance because she did not want to copy anything that could lead to the firing of her co-workers, refused to make copies of documents on December 1 and December 14, 2011; Little also refused to call Plaintiff to the library between December 2 and December 17, 2011, and requested a 30-day law library restriction for Plaintiff; (5) after McCarey asked Plaintiff to sign off on a grievance, McCarey threatened Plaintiff with "consequences" (i.e. that Plaintiff would find himself in "4 block, but not for work"), if Plaintiff did not sign off and if Plaintiff continued to file grievances; McCarey also fabricated a negative work evaluation about Plaintiff; and (6) Mitchell refused to provide Plaintiff with legal materials, and after he saw Plaintiff's complaint against MacDonald and Bassett, he threatened to "make it hard" on Plaintiff and subsequently had Plaintiff transferred to the Transition Unit.[8] *See* Section I, *infra*. Plaintiff's allegations against Defendants Benson, Haske, Hornkohl, Little, McCarey, and Mitchell suffice to warrant service of his retaliation claims against them.

---

[8]The Court does not address Plaintiff's conspiracy-to-retaliate claim in this Section (*see* Compl. ¶ 142(b)); that claim is addressed in Section II.E., *infra*.

### C.       Access to the Courts

Plaintiff contends that the failure by Defendants Bassett and MacDonald to process or acknowledge his grievances denied him his right of access to the courts.  It is well established that prisoners have a constitutional right of access to the courts.  *See Bounds v. Smith*, 430 U.S. 817, 821 (1977).  In order to state a viable claim for interference with access to the courts, however, a plaintiff must show "actual injury."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999).  In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim.  *Lewis*, 518 U.S. at 351-353.  Moreover, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation."  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3).

Defendants' conduct in connection with the grievance process cannot compromise Plaintiff's access to the courts.  Plaintiff asserts that Defendants have rendered possible future legal claims subject to dismissal because he has not been able to exhaust his administrative remedies.  *See* 42 U.S.C. § 1997e(a) (requiring prisoners to exhaust available administrative remedies before bringing a federal action against prison officials).  The exhaustion requirement of § 1997e only mandates exhaustion of "available" administrative remedies, however.  *Id.*  Thus, if Defendants prevented Plaintiff from using the grievance process to exhaust his administrative remedies, then that process would not be "available" to him, and exhaustion of that process would not be a prerequisite for initiation of an action.  Consequently, Plaintiff does not state an access-to-the-courts claim against Defendants Bassett and MacDonald.

### D.      Due Process

Plaintiff contends that Defendant Mitchell violated Plaintiff's rights under the Fourteenth Amendment when he imposed the seven-day loss-of-privileges sanction without holding a hearing.  (Compl., Page ID#36.)  Though Plaintiff contends that Mitchell's conduct is an "equal protection" violation (*id.*), the Court construes Plaintiff's claim as a due-process challenge under the Fourteenth Amendment.

A prisoner's ability to challenge prison misconduct proceedings on due-process grounds depends on whether the misconduct conviction implicated any liberty interest.  In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior.  The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison.  But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior.  Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest."  But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Plaintiff does not allege that his misconduct conviction resulted in any loss of good-time credits, nor could he.  The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[9] for prisoners convicted for crimes occurring after April 1, 1987.  In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence.  Rather, it merely affects parole eligibility, which remains discretionary with the parole board.  481 F.3d at 440. Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement.  355 F. App'x at 912.  In the absence of a demonstrated liberty interest, Plaintiff has no due-process claim based on the loss of disciplinary credits.  *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

Even in the absence of a protectible liberty interest in disciplinary credits, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in a significant, atypical deprivation.  *See Sandin v. Connor*, 515 U.S. 472 (1995).  Plaintiff does not identify any significant deprivation arising from his misconduct convictions.  The Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process.  *See, e.g., Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999).  Likewise, the sanction that

---

[9]For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system.  MICH. COMP. LAWS § 800.33(5).

Plaintiff received, seven days of loss of privileges, was not an atypical and significant deprivation. *See Ingram*, 94. F. App'x at 273 (14-day loss-of-privileges sanction is not significant and atypical). Because Plaintiff has not alleged that his misconduct conviction implicated a protected liberty interest, he does not state a due-process claim against Defendant Mitchell.

### E. Conspiracy

Plaintiff alleges that Defendants Haske, Murtland and Thomas conspired to prepare a negative work evaluation, and that Defendants Haske, Hornkohl and Mitchell conspired to impose an out-of-place misconduct sanction on Plaintiff. To state a claim for conspiracy, a plaintiff must plead with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *Smith v. Rose*, 760 F.2d 102,106 (6th Cir. 1985); *Pukyrys v. Olson*, No. 95-1778, 1996 WL 636140, at *1 (6th Cir. Oct. 30, 1996). A plaintiff's allegations must show (1) the existence or execution of the claimed conspiracy, (2) overt acts relating to the promotion of the conspiracy, (3) a link between the alleged conspirators, and (4) an agreement by the conspirators to commit an act depriving plaintiff of a federal right. *Lepley v. Dresser*, 681 F. Supp. 418, 422 (W.D. Mich. 1988). "[V]ague allegations of a wide-ranging conspiracy are wholly conclusory and are, therefore, insufficient to state a claim." *Hartsfield v. Mayer*, No. 95-1411, 1996 WL 43541, at *3 (6th Cir. Feb. 1, 1996). A simple allegation that defendants conspired to cover up wrongful actions is too conclusory and too

speculative to state a claim of conspiracy.  *Birrell v. Michigan,* No. 94-2456, 1995 WL 355662, at
*2 (6th Cir. June 13, 1995).

1.   <u>Haske, Murtland and Thomas</u>

Plaintiff claims that Defendants Haske, Murtland and Thomas conspired to fabricate
the October 11, 2011, negative work evaluation about Plaintiff, which will remain in his institutional
file and will adversely affect his ability to obtain prison employment.  It is not at all clear from the
complaint, however, that the report is inaccurate or that Defendants have done anything improper.
Plaintiff indicates that Defendants wrote or signed the report on October 11, though he had not
worked since September 29.  The report itself, however, does not specify the time period under
review.

Even assuming that the report is entirely false, Plaintiff alleges no facts indicating
that Defendants conspired together to violate his rights.  Plaintiff does not have a cognizable federal
or constitutional right to an accurate prison work evaluation, or even to a prison job.  *See Newsom*,
888 F.2d at 374.  Plaintiff *does* have a constitutional right to avoid retaliation for engaging in
protected conduct, but he does not allege that the negative work evaluation was a retaliatory act, and
there is no indication that it was motivated by any of Plaintiff's protected conduct.  Moreover, even
if Plaintiff had alleged that the work report was retaliatory, it would not support a retaliation claim.
*See Rocha v. Zavaras*, 443 F. App'x 316, 317, 319 (10th Cir. 2011) (a low work evaluation is not
sufficiently adverse to state a retaliation claim).

In short, Plaintiff merely alleges that Defendants conspired to fabricate a negative
work evaluation, which is not a violation of Plaintiff's rights.  Without an unlawful act causing
injury, Plaintiff cannot state a conspiracy claim.  *See Farhat v. Jopke*, 370 F.3d 580, 599 (6th Cir.

-22-

2004).  Therefore, Plaintiff fails to state a conspiracy claim against Defendants Haske, Thomas and Murtland with respect to the negative work evaluation.

### 2.  Haske, Hornkohl and Mitchell

Defendants Haske, Hornkohl and Mitchell allegedly conspired to retaliate against Plaintiff by having him convicted him of a class III misconduct for being out of place.  Haske charged Plaintiff with the misconduct after Plaintiff attempted to resolve a grievance with her, Hornkohl corroborated the report by stating, falsely, that he did not give permission for Plaintiff to be in the hallway outside the library, and Mitchell determined that Plaintiff was guilty after confirming the incident with Haske and Hornkohl.

Plaintiff's claim that Haske, Hornkohl and Mitchell conspired to retaliate against him is unsupported.  Plaintiff notes that Mitchell spoke with Haske and Hornkohl before making his determination, but there is no indication that Defendants agreed or conspired to retaliate against Plaintiff or to violate his rights.

Moreover, even if Defendants conspired to retaliate against Plaintiff, Plaintiff's minor misconduct conviction would not support a retaliation claim.  In *Ingram v. Jewell*, 94 F. App'x 271 (6th Cir. 2004), the Sixth Circuit determined that fourteen days of lost privileges as a result of a misconduct charge does not constitute an adverse action for purposes of a retaliation claim.  *Id.* at 273.  Similarly, Plaintiff's seven-day loss of privileges is not sufficiently adverse to state a retaliation claim.

Furthermore, Plaintiff cannot state a retaliation claim because a "[a] finding of guilt based upon some evidence of a violation of prison rules 'essentially checkmates [a] retaliation claim.'"  *Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005) (citing *Henderson v. Baird*, 29

-23-

F.3d 464, 469 (8th Cir. 1994)).  The misconduct report shows that there was some evidence to support Defendant Mitchell's findings.  The report notes:

> I spoke with Officer Hornkohl at 12:05 hour[s] on 10/14/11 and asked him if he gave Gordon permission to be in the hallway.  Officer Hornkohl stated specifically that he did not authorize Gordon to be in the hallway and he did not authorize[] Gordon to be out of place speaking with Mrs. Haske.  I then had a phone conversation with Mrs. Haske at 12:21 hours and she made it clear that Gordon waits to see her exit the office area and then exits the Law Library to speak with her without permission. This has happened several times in the last two weeks.

(Ex. P, 10/14/2011 Class II & III Misconduct Hr'g Report.)  Plaintiff asserts that Hornkohl gave him permission to be in the hallway, but he does not allege that Hornkohl gave him permission to be out of place speaking with Haske, and he does not dispute Haske's assertion that he had spoken with her in the hallway on several prior occasions without permission to be there.  Thus, even without Hornkohl's allegedly false statement, Mitchell had some evidence on which to base the misconduct conviction, and that evidence checkmates Plaintiff's retaliation claim.  For all of the foregoing reasons, therefore, Plaintiff does not state a conspiracy claim against Defendants Haske, Hornkohl, and Mitchell with respect to the misconduct conviction.

### III.   Preliminary Injunction

Plaintiff requests a preliminary injunction and/or temporary restraining order requiring Defendants to transfer Plaintiff to another facility.  Plaintiff contends that Defendants have impeded his access to the courts by refusing to process his grievances, limiting his access to the law library, and preventing him from making copies of documents.  He contends that they will continue to impair his rights, or will retaliate against him in other ways, when they learn of this action.

The issuance of preliminary injunctive relief is committed to the discretion of the district court.  *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v.*

*Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).  In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction.  *Id.*  These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers.  *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal.*, 467 F.3d at 1009.  Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting.  *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432 at 438, n.3 (6th Cir. 1984).  The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances.  *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1986).

Under controlling Sixth Circuit authority, Plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action.  *NAACP v. Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989).  Plaintiff has not made such a showing.  It is not at all clear from Plaintiff's *pro se* complaint or subsequent filings that Plaintiff has a substantial likelihood of success on his retaliation or equal protection claims.  Although the Court makes no final determination on this issue, it appears at this preliminary stage that Plaintiff has not made a substantial showing of a violation of any of his

constitutional rights.  Second, the presence of irreparable harm is not evident.  A plaintiff's harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages.  *See Overstreet*, 305 F.3d at 578.  There is no indication that Defendants' conduct, even if it is ongoing, threatens Plaintiff with any concrete, irreparable harm.  Plaintiff asserts that Defendants may prevent him from filing responses in this action, but Plaintiff has been able to file his complaint and motion for relief without incident.  Moreover, the Court can address Plaintiff's concerns regarding filings in this case as they arise without resort to the injunctive relief requested by Plaintiff.  Thus, Plaintiff has not set forth specific facts showing an immediate, concrete and irreparable harm in the absence of an injunction.

Third, the interests of identifiable third parties and the public at large weigh against an injunction.  Decisions concerning prison security are vested in prison officials, in the absence of a constitutional violation.  Any interference by the federal courts in the administration of state prisons is necessarily disruptive.  The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights.  *See Glover v. Johnson*, 855 F.2d at 286-87.  That showing has not been made here.

Finally, the Court notes that the relief sought by Plaintiff is no longer necessary because he is already located at another prison facility.  Therefore, for all of the foregoing reasons, Plaintiff's request for preliminary injunctive relief will be denied.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that all of Plaintiff's claims against Defendants Bassett, MacDonald, Murtland, and Thomas, as well as his equal protection claims (other than his claim against Defendant Benson), due-

process claims, access-to the-court claims, and his conspiracy claims will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will allow service of the remaining claims in the complaint on Defendants Benson, Haske, Hornkohl, McCarey, Mitchell, and Little.  Finally, the motion for a preliminary injunction and/or temporary restraining order will be denied.

Orders consistent with this Opinion will be entered.


Dated:  June 28, 2012                             /s/ Janet T. Neff                                  
                                                  Janet T. Neff
                                                  United States District Judge